# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CEDRIC WILLIAMS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14 C 5075 |
| v. | ) | |
| | ) | Magistrate Judge Daniel G. Martin |
| **CAROLYN COLVIN,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cedric Williams ("Plaintiff" or "Williams") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for supplemental security income benefits and disability insurance benefits under Title II and Title XVI of the Social Security Act. Williams then filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross-motion. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, Plaintiff's motion is denied. The Commissioner's motion is granted.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if

he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

**B.  Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an administrative law judge's ("ALJ") decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  Background Facts

The Court declines to review the facts or the medical records in this case in detail.  Williams claims that he was disabled, in part, as the result of various problems that stemmed from gunshot wounds he received in July 2009.  The great majority of the records

that were available to the ALJ at the time of the Commissioner's decision concerned Williams' physical injuries. Williams does not contest the ALJ's conclusions on any of these topics. He only addresses issues related to his mental impairments.

As the ALJ noted, few records existed at the time of her decision concerning Plaintiff's depression and anxiety. Williams was ordered by a court to undergo counseling after a domestic violence incident. Based on his treatment sessions Lea Kirby, the Executive Director of Serving At Risk Families, wrote a letter on April 27, 2011 noting that Williams showed signs of post-traumatic stress syndrome ("PTSD") during his domestic violence consultations. She stated that he began demonstrating signs of panic attacks a few months after his gunshot wounds. Certain conditions and people would trigger feelings of anxiety. This involved feelings of "an impending sense of doom" when he was filling his car with gas, or when Williams saw what he described as "thugs" looking at him. (R. 278).

On December 30, 2011, Williams underwent a consultative exam with Dr. Ana Gil at the request of the Social Security Administration. He told Dr. Gil that he was easily startled, had serious difficulty sleeping, and frequently had nightmares. Groups of people, particularly young people, make him anxious. He has intrusive thoughts and flashbacks on a daily basis. Williams described persistent anxiety attacks that caused him to suffer shortness of breath, tachycardia, and a sense of dread. He is unable to travel by himself due to these symptoms, which happen several times a week. He also told Dr. Gil that he did not use alcohol, though he later told the ALJ that he drank a pint of vodka every two to three days. Williams rarely goes out alone because he only trusts a few people. Dr. Gil found that Williams was cooperative and had logical thought patterns. His affect was restricted and dysphoric. She diagnosed him with chronic PTSD at a severe level and

4

panic attacks with agoraphobia at a moderately severe level. (R. 380-84).

On January 19, 2012, state-agency psychologist Dr. David Voss issued a Psychiatric Review Technique ("PRT") and a mental RFC assessment for Williams. Like Dr. Gil, he found that Plaintiff suffered from PTSD and panic attacks with agoraphobia. Dr. Voss concluded that Williams had mild limitations in his activities of daily living ("ADLs") and concentration, with a moderate restriction in social functioning. The RFC assessment found no significant limitations in any but four of the functional categories that are routinely included in such state-agency RFC assessments. Moderate restrictions were assessed in concentration, working in proximity with others, interacting with the public, and getting along with coworkers. (R. 385-401).

Psychological expert Dr. Larry Krabitz appeared at the April 1, 2013 administrative hearing. He told the ALJ that the record concerning Williams' mental health was very limited. Like Dr. Gil and Dr. Voss, Dr. Krabitz did not find that Williams suffered from depression. He stated that Williams did not show the inertia and dysphoric symptoms necessary for that finding. Dr. Krabitz's testimony on Williams' functional limitations was not entirely clear. He appeared to agree with Dr. Voss that Plaintiff would have mild limitations in his ADLs and moderate restrictions in social functioning. Relying on Lea Kirby's brief treatment note, however, the psychological expert seems to have assessed a moderate limitation in Williams' concentration, persistence, and pace. (R. 86, "So I think those sort of symptoms would create more than mild limitations in persistence on an extended basis.").

Williams also underwent counseling in 2011 at the Woodlawn Mental Health Center. The Woodlawn records were not available to the ALJ at the hearing or at the time she

issued her decision. They were later submitted for the first time to the Appeals Council. Because Williams' challenge of the ALJ's decision rests entirely on the Woodlawn notes, they are discussed more fully below.

On May 20, 2013, ALJ Judith Goodie issued a written decision finding that Williams was not disabled. Following the familiar five-step analytic process, she found at Step 1 that Williams had not engaged in substantial gainful activity since his alleged onset date of July 30, 2009. His severe impairments at Step 2 were status-post multiple gunshot wounds with open reduction internal fixation of the left elbow and bilateral femur rods, left knee pain, right hip pain, PTSD, and panic attacks. These impairments did not meet or equal a listing at Step 3, either singly or in combination. Before moving to Step 4, the ALJ found that Williams' testimony concerning the frequency and severity of his symptoms was not credible. She assigned "significant" weight to Dr. Voss. Even "more weight" was given to psychological expert Dr. Krabitz. The ALJ also assessed Williams' RFC at length. At Step 4, the ALJ found that Williams could not perform his past relevant work. Relying on the testimony of a vocational expert at Step 5, the ALJ determined that jobs existed in the national economy that Williams could perform. She therefore concluded that he was not disabled.

### III. Discussion

Williams presents only a limited challenge to the ALJ's decision. He does not contest her evaluation of the evidence that was available to her at the time of the decision. Somewhat unusually, this means that Williams does not argue that the ALJ's credibility or RFC assessments are erroneous based on the non-Woodlawn records. Nor does he argue that the ALJ would have reached a different conclusion on these issues if she were

6

to have reviewed the Woodlawn documents.  He claims instead that: (1) the ALJ erred by allegedly failing to issue a subpoena for the Woodlawn records; (2) the Appeals Council failed to properly consider the new mental health records that were submitted to it; and (3) Williams must be found to be disabled at Step 3.  The last claim is unclear.  It is not certain whether Williams is asking that he be found disabled at this point in light of the Woodlawn documents, or is claiming that the documents mean that the listing issue should be remanded to the ALJ under sentence four of 42 U.S.C. § 405(g).  The first claim fails for the reasons stated below.  The second is inappropriate.  *See Jirau v. Astrue*, 715 F. Supp.2d 814, 824 (N.D. Ill. 2010) ("[A]ny evidence not before the ALJ cannot be considered by the district court as a basis for a sentence four remand, even if it was before the Appeals Council").

## A.    The Subpoena Issue

An ALJ has an ongoing duty to develop a full and fair record in a disability case. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Williams claims that the Commissioner has the burden of showing that the ALJ carried out this obligation.  However, the Commissioner has the burden of proof on the issue when a claimant does not validly waive his right to counsel.  *Dyson v. Massanari*, 149 F. Supp.2d 1018, 1025-26 (N.D. Ill. 2001).  That does not apply here.  Ordinarily a significant omission is required to demonstrate error.  *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).  A claimant can do so by setting forth "specific facts – such as medical evidence – that the ALJ did not consider."  *Nelms*, 553 F.3d at 1098.  The regulations give an ALJ the power to assist in these matters by issuing subpoenas to obtain medical

records.  20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1).  A claimant is not automatically entitled to a subpoena as a matter of course.  *See Butera v. Apfel*, 173 F.3d 1049, 1057-59 (7th Cir. 1999).  Subpoenas are appropriate "when it is reasonably necessary for the full presentation of a case."  *Id*.  The regulations also lay out procedures and standards that must be met.  20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2).  This gives an ALJ the discretion to determine if a subpoena is necessary.  *See Passmore v. Astrue*, 533 F.3d 658, 661-62 (8th Cir. 2008).

Williams claims that ALJ Goodie violated this standard by rejecting what he characterizes as his attorney's repeated requests to issue a subpoena for the Woodlawn mental health records.  He further claims that the ALJ failed to leave the record open for the submission of these documents, rejected the opinions of the treating doctors at Woodlawn, and ignored the opinions of the consultative doctors.  Williams contends that, had she acted properly, the ALJ would have had before her a critical diagnosis by a treating physician.  Relying on *Morgan v. Astrue*, 393 Fed.Appx. 371 (7th Cir. Aug. 2, 2010), Williams claims that ALJ Goodie abrogated her basic duty to develop the record properly. The Court addresses these claims in reverse order.

Williams' reliance on *Morgan* is misplaced.[1]  The Seventh Circuit found that the ALJ in that case erred by assessing the claimant's RFC without any supporting evidence.  No physician had assessed the plaintiff's RFC prior to the administrative decision.  No medical

---

[1] The Court is thoroughly familiar with *Morgan*.  After the Seventh Circuit remanded it to the Social Security Administration for further consideration, the claimant in that case once again appealed the ALJ's subsequent denial of his disability application.  His case was then assigned to this Court, which recently upheld the ALJ's decision.  *Morgan v. Colvin*, 2015 WL 5116961 (N.D. Ill. Aug. 28, 2015).

expert was present at the hearing, where the plaintiff appeared *pro se*. The record did not support what the ALJ assessed in the RFC. In addition, substantial evidence did not support the ALJ's credibility findings. *Id.* at 374-75. None of these shortcomings apply to this case. A consulting expert – Dr. Gil – assessed Williams' mental functioning. The state-agency expert Dr. Voss issued the PRT and RFC assessment. And unlike in *Morgan*, ALJ Goodie had a psychological expert at the hearing to provide his analysis of the record. As for the credibility issue, Williams does not contend that the ALJ would have reached a different credibility finding had she reviewed the Woodlawn records.

Williams' allegations about the consulting and treating physicians are equally meritless. They also raise serious questions about Plaintiff's account of the record that have given the Court considerable pause. Williams claims that the ALJ ignored the opinions of the "consulting doctors" at Woodlawn. (Mot. at 9). The Court has no idea what Williams is referring to. The Woodlawn documents do not contain a report by a doctor, consulting or otherwise. Plaintiff does not even identify who these (allegedly plural) consulting physicians are. As it stands, the ALJ's decision considered the expert opinion of state-agency physician Dr. Voss. A non-examining state-agency expert is a "consulting" doctor. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (assessing the "report of the nonexamining consultant"). The ALJ also considered the report of the examining consultant Dr. Gil. Insofar as Williams claims that some other consultant exists, he fails to explain what he means.

Williams alleges several times that the Woodlawn records were critical because they contained the opinion of his "treating physician." Williams' reply even cites the regulations that tell an ALJ that the report of a treating doctor is ordinarily entitled to controlling weight.

9

The problem with this claim is that the Woodlawn records do not contain any statement by a treating physician. Williams underwent months of counseling in 2011 with Steven Dyson, LCPC, LPHA. Plaintiff has made no showing that Dyson was a physician or a clinical psychologist. Dyson did not add the usual credentials of an M.D. or Ph.D to his name on the mental health diagnoses and two treatment notes contained in the Woodlawn records. (R. 514, 528). Indeed, Williams' counsel told the ALJ at the first hearing on January 7, 2013 that "I thought that [Dyson] was a doctor at Woodlawn. But I believe he's a therapist." (R. 109). That makes it even more troubling that Williams claims at this point that Dyson was his treating physician.

Dyson was not only not a doctor, as Williams claims, he may or may not have been a "treating source." Social Security Ruling 06-3p explains that individuals involved in a claimant's care or education should be categorized as "treating," "acceptable," or "other" sources. The Ruling sets out guidelines for deciding what category applies to such individuals as physicians, therapists, nurses, and social workers. The criteria for a treating source are definitively stated in 20 C.F.R. § 404.1502. That regulation makes clear that someone can only be a treating source if he is first an "acceptable medical source." *Id*. As an LCPC, Dyson was a licensed clinical professional counselor. It is well-established that the credential of an LCPC does not make a therapist an acceptable medical source under the regulations or SSR 06-3p. *Compton v. Colvin*, 2013 WL 870606, at *10-11 (N.D. Ill. March 7, 2013) (citing cases); *Perrigo v. Colvin*, 2014 WL 2892406, at *6 (S.D. Ill. June 26, 2014). Without being an acceptable source, Dyson could not have been a treating source based on his LCPC credential.

Dyson also had an LPHA credential. An LPHA is a health care practitioner licensed

in Illinois who can diagnose and recommend treatment concerning mental illness. This includes physicians, advanced nurse practitioners, clinical psychologists, licensed social workers, professional counselors, or marriage and family therapists. *N.B. v. Hamos*, 26 F. Supp.3d 756, 767 n.7 (N.D. Ill. 2014). Some of these professionals qualify as acceptable medical sources. Others, like licensed social workers, do not. *See* SSR 06-3p. A therapist who is an LPHA may or may not be a treating source. *See Pontarelli v. Colvin*, 2014 WL 3056616, at *6 (N.D. Ill. July 7, 2014). Inexplicably, Williams makes no attempt to explain why Dyson is an acceptable medical source or why, assuming he met that standard, he can also be considered a treating source. That fails to account for fundamental issues involved in Plaintiff's claims.

This only leaves Williams' first and most problematic allegation – ALJ Goodie erred by not keeping the record open for the new treatment documents, refused to issue a subpoena for them, and then ignored repeated requests by Williams' counsel to do so. Williams' conclusory allegation that the ALJ refused to keep the record open is inadequate. Plaintiff once again does not explain important aspects of what took place in regard to his claim. This essentially shifts the burden to this Court to gather the relevant facts and examine them in light of the applicable standard. That is improper. Plaintiff, not the Court, bears the burden of showing why ALJ Goodie failed to carry out her duty to develop a full and fair record. Courts "are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson v. Cambridge Inds., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). *See also Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) ("Judges are not like pigs hunting for

truffles . . . and the Seventh Circuit has stressed time and time again that it is not a judge's responsibility to research and construct the parties' arguments.") (citations omitted).

That said, the Court has carefully examined the record on this issue. It shows the following facts. On June 20, 2012, Williams' counsel sent a letter to Woodlawn together with a release form that requested Plaintiff's treatment records. (R. 315). An administrative hearing was then held on January 7, 2013. Plaintiff's counsel appeared. Williams did not show up; he claimed that he had experienced a panic attack. His attorney told the ALJ that she had called Woodlawn "periodically" since June 2012 without being able to obtain the records. (R. 108). ALJ Goodie then gave counsel 30 additional days to get them. (R. 113). A second hearing took place on April 1, 2013. Williams' counsel told the ALJ that she had sent off for the records in June 2012. She had also "sent them three [or] four [more] requests," though counsel did not say if that was before or after the January 7 hearing. (R. 53). The record contains no evidence of these requests. Counsel then conceded that she had not bothered to call Woodlawn since the January 7 hearing. (R. 101, "ALJ: You told me when you were here in January, that you needed 30 days to get the records from Woodlawn. / ATTY: Right, and they still haven't responded. / ALJ: Have you called and spoken with someone there? / ATTY: Well, I haven't called and spoken with anybody."). Counsel told the ALJ that Woodlawn did not always answer the phone, but promised to call when she returned to her office. The ALJ then gave Williams' counsel an additional 15 days to get the records. (R. 101-02).

As this shows, ALJ Goodie did not refuse to hold the record open. Over six months expired from the initial request for documents made in June 2012 to the January 7, 2013 hearing. The ALJ then gave Williams three-and-a-half months from January 7 to April 16,

2013 to obtain the records. The ALJ did not even definitively close the record at that point for the reasons identified below.  It is difficult to understand how Williams can claim that the ALJ did not keep the record open when she gave him from January 7, 2013 through April 16, 2013 and beyond to get the Woodlawn documents.  Plaintiff has not accounted for these facts, nor has he explained why his counsel told the ALJ on April 1 that she had not even called Woodlawn after the first hearing.  Counsel only stated that Woodlawn did not always answer the phone.  That issue is moot, as counsel admitted that she had not tried to reach the facility.

The subpoena issue raises similar evidentiary concerns.  Williams' blanket claim that ALJ Goodie "failed" to issue a subpoena for the documents does not construe the record properly.  His attorney asked the ALJ at the April 1 hearing if she would issue a subpoena.  The ALJ initially agreed.  (R. 101, "Yeah.  The record?  Yeah.").  Several modifications of that position then ensued as the conversation developed.  When counsel indicated that she had not tried to contact Woodlawn herself, the ALJ stated that it might be easier and more productive if the ALJ sent a letter instead of a subpoena.  The conversation then concluded with counsel agreeing to try to obtain the records herself in a shorter period of time:

| | |
|---|---|
| ALJ: | Thank you.  So, what do you say?  15 days *for you to try*? |
| ATTY: | Can you *give me* at least about 20, your honor? |
| ALJ: | Okay, I'll tell you, I'm retiring at the end of May. |
| ATTY: | Oh, that's right. |
| ALJ: | I want to be sure we got this wrapped up before I'm gone. |
| ATTY: | Okay, okay.  I'm going to go with the 15. |
| ALJ: | Because now that I've met the claimant, I want to be the one who decides this. |
| ATTY: | I'll go with the 15. |
| ALJ: | Fifteen days. |
| ATTY: | Thank you. |

ALJ:        For everything from Woodlawn.
ATTY:       Okay.

(R. 101-02) (emphasis added).  The record does not contain any other comment by the ALJ concerning the subpoena.  These quotes show that ALJ Goodie did not "fail" to issue the subpoena, at least in the pejorative manner that Williams relies on to accuse her of wrongdoing.  The ebb and flow of the hearing testimony indicates that the ALJ considered the subpoena option, changed her mind to issuing a letter, and then asked counsel to attempt once more to take care of the issue.  Counsel agreed, stating no objection to the ALJ's request.

Instead of discussing what took place at the hearing, Williams claims that the ALJ subsequently refused to respond to what he describes as repeated requests to issue the subpoena.  He cites no evidence relevant to the issue.  Referring to pages 117 through 120 of the record, he claims that he gave the ALJ a copy of the release form to be sent to Woodlawn.  But the pages that Williams cites only contain official agency documents such as a transmittal letter and an explanation of benefits.  They say nothing about the release form.  Williams also cites pages 331 and 333 to support an allegation that his counsel sent a letter to the ALJ and called the ALJ's office.  In reality, both pages show 2009 medical reports from Advocate Health Care that have no bearing on the issue.

The Court assumes that Williams intends to rely on a "report of contact" that is found on page 313 of the record and a letter sent to ALJ Goodie found on page 314.  Both of these documents undercut Williams' claims.  An assistant to Williams' counsel named "Debra" called the ALJ's office on April 16, 2013.  That was the date that ALJ Goodie set at the hearing for counsel to get the Woodlawn documents.  An agency "report of contact"

14

notified the ALJ that Debra had "stated that she has not been able to get MER from Woodlawn. She also stated that Judge Goodie told her that if her attempts fail that the Judge would Subpoena [sic] the MER. Please advise." (R. 313). Plaintiff does not dispute that this report accurately memorializes what "Debra" said in the April 16 call. But Debra's assertion that the ALJ had promised to issue a subpoena is simply false. The discussion quoted above plainly shows that the ALJ thought a letter would be preferable to a subpoena. She later repeated that suggestion. The ALJ said at the end of the hearing that if counsel was unable to obtain the Woodlawn documents within 15 days "let me know exactly what you want to request, then *I'll letter it*, and tell me the results that you had." (R. 103) (emphasis added). The distinction between a subpoena and a letter may not be determinative if the ALJ really had an obligation to take independent action to get the Woodlawn documents. However, Plaintiff's failure to note what took place (and what "Debra" said took place) again raises concerns about the degree to which Williams has accurately accounted for what transpired in this case.[2]

---

[2] The point does not merely concern Plaintiff's account of the record. Williams lays all responsibility for the non-issuance of a subpoena on ALJ Goodie. He fails to note that the regulations place mandatory procedural requirements on a claimant who wants a subpoena:

> Parties to a hearing who wish to subpoena documents or witnesses must file a written request for the issuance or a subpoena with the [ALJ] or at one of our offices at least 5 days before the hearing date. The written request must give the names of the witnesses or documents to be produced; describe the address or location of the witnesses or documents with sufficient detail to find them; state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.

20 C.F.R. § 416.1450(d)(2). The record does not show that Williams complied with any of these requirements. The Court does not discuss the issue further because neither party

15

That concern is deepened by a letter that was sent to the ALJ the next day on April 17, 2013. "Debra" appears to have called Woodlawn after she contacted the ALJ's office on April 16. She then wrote the ALJ a letter stating: "I called Woodlawn [ ], a Ms. Garret answered. She informed me to send a [sic] updated release and she will forward the medical records. There is a copying service that comes into their facility every two weeks to copy files." (R. 314). This is the only indication in the record that Williams' counsel had called Woodlawn following the January 7 hearing. Williams claims in a conclusory manner that this letter gave the ALJ all of the information that she needed to write the promised letter or issue a subpoena.

The opposite is true. It is unreasonable to infer that the letter should have alerted the ALJ that she was responsible for requesting the Woodlawn records on her own. The April 17 communication to the ALJ did not ask her to take any independent action. ALJ Goodie had said at the hearing that she would send a letter only if counsel herself was unable to get the documents. But the April 17 letter shows that counsel *was* in a position to handle the matter on her own. All that was necessary was to submit a standard release form. Counsel had that form because she had given a copy of it earlier to the ALJ. Attorneys routinely issue such forms in cases of this type. Moreover, the regulations place the primary responsibility for doing so on the claimant, not the ALJ. 20 C.F.R. § 404.1514 ("You [claimant] are responsible for providing [specific medical] evidence."). It is true that Williams' counsel had sent such a form to Woodlawn in June 2012 without success. For whatever reason, though, Woodlawn indicated that it was now willing to respond to an

has addressed it.

updated request. The ALJ could have reasonably concluded from the April 17 letter that counsel would send the request herself. In fact, that is the only logical inference. Why would the ALJ have thought that she needed to send an official letter when "Debra" had just told the ALJ that all Woodlawn needed was for Debra herself to send a standard release form? (R. 314, "She informed *me* to send . . . .) (emphasis added).

Insofar as Williams is complaining that the ALJ should have kept the record open following the April 16 cutoff for obtaining the Woodlawn documents, he fails to explain anything about what took place after that date. For example, Plaintiff does not state what action his counsel took after the April 17 letter to get the Woodlawn documents. Did she promptly send the release form herself? Did she hold back in expectation that the ALJ would issue the letter? Did she keep ALJ Goodie informed of the status of events, knowing full well that the ALJ was anxious to issue the decision before she retired in May? And when were the records actually received? Williams does not say.[3] He presumably obtained the documents after the ALJ issued the decision on May 20 and the time when he submitted them to the Appeals Council on June 2, 2013. For all the Court can discern, ALJ Goodie was left in the dark with only with the April 17 letter stating that the Woodlawn documents were available upon the submission of a proper release form from Williams' counsel.

There is no indication that ALJ Goodie would not have considered the Woodlawn documents if Williams had submitted them after April 16. The ALJ's stated willingness to

---

[3] Williams suggests that the April 17 letter was his counsel's last communication with the ALJ's office. (Mot. at 6, n.3). That would support a finding that Williams did not keep the ALJ informed about his efforts to get the records, or give her any information that might have led her to delay issuing a ruling.

send a request letter if counsel was unable to get the documents by April 16 suggests as much.  So does a footnote the ALJ included in her decision indicating that counsel had not submitted the Woodlawn documents.  The footnote states for the first time that the "record is closed."  (R. 35).  Taken at face value, the ALJ held the record open through the time that she issued her decision on May 20, 2013.

It is true that an ALJ cannot adopt a passive attitude and rely under all circumstances on the records that a claimant's attorney submits.  *See Fleming v. Barnhart*, 284 F. Supp.2d 256, 272 (D. Md. 2003).  An ALJ also cannot always rely on the fact that she requested additional documents from counsel but did not receive them.  *Newsome v. Astrue*, 817 F. Supp.2d 111, 137 (E.D.N.Y. 2011).  That is not what the ALJ in this case did.  An ALJ can fulfill her obligation to develop the record in a number of ways.  She can keep the record open for a period of time.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2011) (stating that an ALJ fulfills her duty by "keeping the record open after the hearing to allow supplementation of the record").  ALJ Goodie did that by holding the record open after both hearings so that Williams' counsel could get the Woodlawn records. An ALJ can also direct the claimant to undergo an expert examination.  *See Caldwell v. Astrue*, 804 F. Supp.2d 1098, 1102 (D. Or. 2011) ("[T]he ALJ may fulfill this duty to supplement the record by ordering a consultive examination.").  The ALJ ordered a consulting examination of Williams by Dr. Gil that post-dated his treatment at Woodlawn.  Most importantly, she offered to intervene if counsel could not get the Woodlawn records on her own.  The Court finds that ALJ Goodie was entitled to rely under these facts on Williams' counsel to take proper action on the matter.  *See*, *e.g.*, *Rivera v. Comm. of Soc.*

*Sec.*, 728 F. Supp.2d 297, 330 (S.D.N.Y. 2012) ("Courts do not necessarily require ALJs to develop the record by obtaining additional evidence themselves, but often permit them to seek it through the claimant or his counsel. . . . Accordingly, the ALJ's request that plaintiff's attorney obtain the recent treatment records . . . fulfilled his obligations with regard to developing the record."). Williams has not given a persuasive explanation of why his counsel could not have obtained the Woodlawn documents if she had acted with greater promptness. The Commissioner's motion is granted on this issue.

### B.    The Appeals Council

Williams submitted the Woodlawn treatment records to the Appeals Council as part of his request for review on June 2, 2013. The Council denied Plaintiff's request on May 1, 2014. Using boilerplate language that the Council frequently employs, it stated of the Woodlawn documents that "this information does not provide a basis for changing the [ALJ's] decision." (R. 2). Williams claims that the Appeals Council erred because the Woodlawn documents constitute new and material information that it was obligated to consider. The regulations require the Appeals Council to consider "new and material evidence" when it decides if a case qualifies for review. 20 C.F.R. §§ 404.970(b), 416.1470. The evidence must also be relevant to the time of the claimant's application for benefits. *See id*; *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990). If the evidence is both new and material, courts lack jurisdiction to review the Appeals Council's decision not to engage in a plenary review of a claimant's case. *See Stepp v. Colvin*, — F.3d —, 2015 WL 4591886, at *10 (7th Cir. July 31, 2015). Granting Williams' motion on this issue would constitute a remand under sentence six of 42 U.S.C. § 405(g) instead of the more familiar

sentence four remand.

The Appeals Council's reasons for denying Williams' request for review fail to address in any meaningful way whether the Council thought that the Woodlawn documents were either new or material. That is, unfortunately, often the case with the Council's explanation for its decision. However, the Seventh Circuit has interpreted the kind of formulaic statement that the Council made in this case to mean that a claimant's evidence was "non-qualifying under the regulation," meaning that it was neither new nor material. *Ferrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012) (citing 20 C.F.R. §§ 404.970(b), 416.1470 and noting that the Appeals Council's language is inherently ambiguous). The Appeals Council is not required to evaluate such evidence. Under that circumstance, courts review *de novo* the question of whether the Appeals Council made an error of law in reaching its finding. *Id*.

*Ferrell* applies in this case despite the fact that the letter the Appeals Council sent to Williams differs from the one at issue in *Ferrell* in two ways. First, it included additional (again, boilerplate) language that "We considered whether the [ALJ's] action, findings or conclusion is contrary to the weight of evidence of record." (R. 2). Second, the Appeals Council also attached an Order that specifically identified the Woodlawn documents by name, incorporated them as Exhibit 12F, and made them "part of the record." (R. 4). The Seventh Circuit has recently clarified that this is insufficient to differentiate the Appeals Council's reasoning from what was present in *Ferrell*. In *Stepp*, *supra*, the Appeals Council used the same language as it did in the instant case concerning the "weight of the evidence." *Stepp*, — F.3d —, 2015 WL 4591886, at *12. *Stepp* found this formulaic

phrase to be little different from what was present in *Ferrell*. *Id*. *Stepp* also involved a similar attached Order that listed the additional evidence that the claimant had not presented earlier to the ALJ. That, too, failed to show that the Council thought that the newly-submitted documents were qualifying under the regulations, even though the Appeals Council said that the evidence was part of the record. *Id*. This Court therefore concludes that it has jurisdiction to review the Appeals Council's decision to deny review because the Council determined that the Woodlawn records were not new or material.[4]

Williams claims that the Appeals Council erred because the Woodlawn records were both new and material. The Commissioner concedes that they are new but argues that they are not material. The Court disagrees with both parties. The Woodlawn documents are neither new nor material. "New" is not construed under 20 C.F.R. §§ 404.970(b) and 416.1470(b) only to mean records that have been submitted for the first time to the Appeals Council. Evidence is new in this context if it was "not in existence or available to the claimant at the time of the administrative hearing." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997); *see also Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005). The Woodlawn treatment documents were certainly in existence prior to either of the 2013 administrative hearings that ALJ Goodie held. They were all written in 2011 or 2012 as part of Plaintiff's treatment at the Woodlawn facility.

---

[4] The ambiguity of the Appeals Council's language is a source of serious concern. Given the staggering number of disability cases that are pending (455 in this District alone), the Council's lack of clarity requires courts to expend their valuable resources in ways that could be better spent resolving the merits of disability appeals. It makes little sense for courts to engage in a nearly metaphysical analysis of language that could easily be stated with perfect clarity. If the Appeals Council finds a claimant's additional documents to be non-qualifying because they are not new or material, it should say so in a straightforward manner.

These records were also "available" to Williams by any reasonable construction of that term. The fact that Williams did not have the records in his possession before the ALJ issued her decision does not mean that they were not available. Williams had legal control over the Woodlawn documents at all times, at least as "control" is interpreted in a litigation context under Fed. R. Civ. P. 34. *See United States v. Approximately $7,400 in U.S. Currency*, 274 F.R.D. 646, 647 (E.D. Wis. 2011) (stating that a litigant controls documents "when [it] has the legal right to those records even though the party does not have a copy of the records") (citing cases). The Court recognizes that Rule 34 does not apply to a disability claimant's proceeding before an ALJ. But the principle remains the same. A patient controls his own medical records. *See Moody v. Honda of Am. Mfg., Inc*., 2006 WL 1785464, at *4-5 (S.D. Ohio June 26, 2006). Patient records are routinely gathered by disability claimants for submission to an ALJ. Claimants have a right to such records upon proper request. Williams may have experienced some difficulty in obtaining the Woodlawn records, but that is not the same as claiming that they were not "available."

The point is important in this case because Williams contends that the documents were unavailable because of the problems he experienced in getting them. The Court disagrees. Williams improperly conflates the availability of medical records with his alleged reason for not producing them. Sentence six of § 405(g) does not permit such a loose construction of its necessary elements. The statute sets out three requirements for remand: "a showing that there is [1] new evidence which is [2] material and [3] that there is good cause for the failure to incorporate" it in the record submitted to the ALJ.[5]  42

---

[5]  Some courts identify only two elements by combining "new" and "material" into one prong of the statute's requirement. Even then, good cause must be shown in addition

U.S.C. § 405(g); *see also Perkins*, 107 F.3d at 1296; *Schmidt*, 395 F.3d at 743; *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). The language of § 405(g) clearly distinguishes between "new" evidence and "good cause" for not producing it. That distinction must be maintained because a statute is given its plain meaning unless doing so would lead to absurd results. *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006). A statute should also be read to avoid rendering some of its parts unnecessary. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotes and citation omitted). These interpretive principles mean that § 405(g)'s careful distinction between "new" evidence – which requires that it be available – and "good cause" for not producing it cannot be collapsed into one another as Williams claims. If that were not the case, the statute's distinction between "new" and "good cause" would be meaningless.

The relevant inquiry is therefore whether Williams had good cause for not obtaining the Woodlawn documents by the time the ALJ issued her decision. A claimant shows good cause by providing a reasonable explanation for not acquiring and producing them to the ALJ in a timely manner. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). The Court finds that no such cause exists for all the reasons explained earlier. Williams has not addressed why his counsel could not have obtained the Woodlawn documents in a timely manner. Even if counsel had acted properly at all times prior to April 16, which the Court

---

to demonstrating that the evidence is new and material. *See Hollon ex rel. Hollon v. Comm. of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) ("The party seeking a remand bears the burden of showing that these two requirements are met.").

finds she did not do, the April 17 letter counsel sent to ALJ Goodie states that counsel could get the documents through a copying service that came every two weeks. (R. 314). That would presumably have made the documents available prior to the ALJ's May 20 decision. Plaintiff has not addressed anything relating to his counsel's actions after April 17. There is no indication when she sent the release form to Woodlawn, why the documents were not obtained more quickly after April 17, or why counsel did not keep the ALJ updated on the issue. Counsel knew that time was critical because the ALJ told her at the hearing that she would be retiring in May 2013 and wanted to issue the decision herself. The Court cannot infer good cause in the absence of any evidence, and without *any* explanation of the basic facts that are central to the issue.

The Woodlawn records are also not material. The fact that documents may be relevant to an issue in an ALJ's decision – which the Woodlawn records clearly are – does not make them material under § 405(g). Evidence submitted for the first time to the Appeals Council is "material" only if "there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered[.] *Perkins*, 107 F.3d at 1296; *see also Foster*, 279 F.3d at 357; *Wilkins v. Sec., Dept. of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). Williams claims that the notes from the "treating doctors" at Woodlawn would have shown the ALJ that he met or equaled listings 12.04 (affective disorders) and 12.06 (anxiety related disorders). The Court interprets the ALJ's decision to mean that the Woodlawn documents were primarily relevant to the ALJ's credibility assessment. The Woodlawn documents are not material to the ALJ's findings on either issue.

There is little possibility, much less a reasonable probability, that the ALJ would

24

have reached a different credibility assessment based on the Woodlawn documents. Plaintiff fails to recognize that the ALJ considered basic aspects of his treatment at Woodlawn even though the records were missing. She noted, for example, that Williams had told her about his mental health treatment there, its lack of success, and the fact that no one at Woodlawn prescribed any psychotropic medication to him. (R. 34-35). The ALJ then discounted Williams' credibility by criticizing the limited extent of treatment that Plaintiff had just described: "According to [Plaintiff's] testimony, despite his subjective symptoms of panic and fear of going out alone and being around strangers, he had only 5 months of mental health therapy visits in 2011[.]" (R. 34). Social Security Ruling 96-7p allowed the ALJ to consider the scope of Williams' treatment in determining how credible he was. The Woodlawn documents would not have changed her decision on this issue. The ALJ would have seen that Williams only had the five months of treatment that he told her he had received. The documents would also have confirmed Williams' testimony that he never received any medication for his symptoms. The ALJ relied on that fact to discount his credibility, as SSR 96-7p permitted her to do.

Moreover, the records would have contradicted Williams' current claim that he was treated by a physician at Woodlawn. Williams presumably raises that issue because the ALJ criticized the absence of a treating source opinion. The Woodlawn records confirm that no such report exists. They only contain lists of diagnoses and two treatment notes of counselor Steven Dyson, whom Plaintiff has not shown is a "treating source" under the regulations. Even if Dyson could be considered a treating source, moreover, he never issued an expert report. Dyson never assessed Williams' RFC, described his work limitations, or addressed his functional restrictions.

The ALJ had before her an expert consulting report issued by psychological expert Dr. Gil. Williams fails to explain what the Woodlawn documents would have added to this evidence. Had she reviewed these records, the ALJ would have discovered that the symptoms that Williams complained about to Dyson were very similar to those that he described to Dr. Gil. Like Dyson, Dr. Gil described nightmares, flashbacks, hypervigilence, intrusive thoughts, and serious anxiety attacks. (R. 383). She assessed Williams with severe PTSD and a moderately severe panic disorder. (R. 383). The only new information that Dyson adds to this mix was his diagnosis of depression. But even then Dyson said that it was only of unspecified severity and did not require medication. (R, 462, 480, 506, 511, 533).

The ALJ also doubted Williams' credibility on a number of other grounds that would not be affected by the Woodlawn documents. She was concerned by the fact that Williams had "not provided a consistent or credible explanation for his failure to appear at the first scheduled hearing on January 7, 2013." (R. 35). His aunt had called that day to say that Plaintiff was having a panic attack. The ALJ noted that Plaintiff then provided a letter that gave "an entirely different explanation for his absence." (R. 35). The ALJ was plainly exasperated by these conflicts, finding an "utter lack of reliability or foundation for both explanations, caus[ing] me to question the claimant's credibility in explaining why he did not show up for the first hearing." (R. 35). She also doubted statements he made that addressed in part the etiology of his panic attacks. Williams claimed that he had been burned at age 14. The ALJ cited evidence that cast doubt on that testimony. She also cited detailed evidence to dispute the reliability of his statements about pain in his legs. The ALJ further took strong exception to contradictions in his testimony concerning his

26

ability to drive a car.  The Court concludes that there is no reasonable probability that the ALJ would have reached a different credibility assessment if she had reviewed the Woodlawn documents.

The same is true for the listing issue.  The ALJ did not consider listing 12.04 (affective disorders) because she did not find at Step 2 that Williams suffered from depression.  Plaintiff claims that the Woodlawn documents show that he meets or equals listing 12.04 as well and listing 12.06 (anxiety related disorders), which the ALJ discussed in her decision.  He points to the fact that Dyson diagnosed him with panic disorder without agoraphobia, PTSD, and depression.  (R. 462).  Williams also notes that Dyson assessed a Global Assessment of Functioning ("GAF") score of 48.

While this evidence would have been relevant to the ALJ's Step 3 consideration, Plaintiff has not shown why it is so compelling that it is reasonably probable the ALJ would have found him to be disabled at Step 3.  An ALJ is required to rely on a medical expert when assessing whether a claimant meets or equals a listing.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).  Even if Dyson was such an expert, he never identified the listing or said anything about whether Williams met it.  Dyson only said that Williams suffered from depression.[6]  It is true that Dyson was more familiar with Plaintiff than the experts the ALJ cited.  However, Dyson had little or no evidence that was not available to the consulting and testifying psychologists.  Dyson noted on several occasions that Williams had racing thoughts, nightmares, intrusive thoughts, and depressive symptoms.

---

[6] Dyson repeatedly stated that Williams' depression had an onset date of October 5, 2011.  That is more than a little surprising given that many of the treatment notes in question predate October 5, 2011.  (R. 462, 467, 506, 525).

(R. 514).  As discussed, Williams told Dr. Gil almost the same things in December 2011.  She found that he was not depressed.  Dr. Voss and Dr. Krabitz agreed.  Moreover, Dyson also thought that the depression was only of  "unspecified severity."  (R, 462, 480, 506, 511, 533).  He even omitted a diagnosis of depression in many documents that otherwise included assessments of PTSD and panic disorder.  (R. 465, 478, 489, 500, 521, 523, 530, 535).  These facts, combined with Dyson's belief that Williams did not require any antidepressant medication, weigh heavily against a conclusion that the ALJ would have set aside the experts she cited in order to find that Williams was so severely depressed that he was disabled under listing 12.04.

The fact that Dyson assessed a GAF of 48 is insufficient to show that remand is necessary.  Neither listing 12.04 nor 12.06 asks an ALJ to consider GAF scores when deciding if a claimant meets or equals the listings' respective criteria.  The score may have been relevant to the ALJ's consideration of Step 3 and the RFC.  That is not the same as demonstrating a reasonable probability that the ALJ would have found Plaintiff disabled.  A GAF score measures both the severity of an individual's symptoms and his functional capacity. "Because the final GAF rating always reflects the worse of the two . . . the score does not reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (internal quote and citation omitted).  Courts have rejected the claim that GAF scores have a direct correlation to the severity requirements of the mental health listings.  *See*, *e.g.*, *Caldwell v. Colvin*, 2014 WL 4328317, at *6 ( S.D. Ind. Aug. 27, 2014).  The Commissioner has reached the same conclusion.  *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000).  An ALJ does not even necessarily err if he omits a discussion of a GAF

score of 40, lower than the 48 that Dyson assessed. *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir. 2003) (referring to the RFC discussion); *see also Anthony v. Astrue*, 2010 WL 4683955, at *12 (C.D. Ill. Oct. 26, 2010) ("The ALJ is not required to specifically address GAF scores, which are intended to be used to make treatment decisions . . . not as a measure of the extent of an individual's disability.") (internal quotes and citation omitted). GAF scores must always be considered in the context of the larger record because "a low GAF score alone is insufficient to overturn an ALJ's finding of no disability." *Bates v. Colvin*, 735 F.3d 1093, 1099 n.3 (7th Cir. 2013). The evidence cited by the ALJ strongly suggests that there is no reasonable probability that she would have reached a different Step 3 decision had she considered Dyson's GAF score of 48.

Finally, a claimant can meet listing 12.04 only if he satisfies the well-known paragraph A and B criteria (assuming, as here, that paragraph C is not at issue). Listing 12.06 (anxiety related disorders) has different paragraph A factors than listing 12.04, but both listings share the same paragraph B elements. The ALJ addressed the paragraph B criteria for listing 12.06 based on statements by the medical experts. Dr. Voss and Dr. Krabitz both said that Williams did not meet those factors for listing 12.06. Both experts were familiar with the allegations that Williams made to Dr. Gil. Since Williams' allegations to Dr. Gil were remarkably similar to what he told Dyson, it is highly unlikely that either expert would have reached a different conclusion on whether Williams met the paragraph B factors for listing 12.06. That necessarily means that they would not have found that he met the same paragraph B factors for listing 12.04. This falls short of showing that it is reasonably probable that the ALJ would have reached a different listing conclusion in light of the Woodlawn documents.

## IV.  **Conclusion**

For all these reasons, Plaintiff's motion for summary judgment [13] is denied.  The Commissioner's motion for summary judgment [17] is granted.  The ALJ's decision is affirmed.

ENTER:

_____

DANIEL G. MARTIN
United States Magistrate Judge

Dated: September 4, 2015.